# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF MICHIGAN

JORDAN DIFFENDERFER and
TYLER KIPPE,

     Plaintiffs,

vs.

Case No. 2024-

Hon.

LOWERY CORPORATION dba APPLIED
IMAGING and dba APPLIED INNOVATION,
a Michigan corporation, JOHN LOWERY,
CASEY LOWERY, JOHN KONYNENBELT,
CHARLIE KEESEE, ANN EMBREE,
KIRK MORGAN, TYLER HAMERSMA,
KYLE MACINTOSH, JARED WIKE,
and JOHN DOES 1-10,

     Defendants.

_____

DILLON & DILLON, P.L.C.
Paul J. Dillon (P46913)
*Attorney for Plaintiffs*
9429 S. Main Street
Plymouth, MI 48170
(734) 455-9000
*pjdillon@ddplc.net*

_____

# COMPLAINT

     Plaintiffs, JORDAN DIFFENDERFER and TYLER KIPPE, by and

through their attorneys, DILLON & DILLON, P.L.C., hereby make the

following Complaint:

1.     Plaintiffs, **JORDAN DIFFENDERFER** (hereafter "Plaintiff JORDAN

DIFFENDERFER" or "Plaintiff") and **TYLER KIPPE** (hereafter "Plaintiff

TYLER KIPPE" or "Co-Plaintiff") are a married couple residing in the County

of Kent, State of Michigan. At all times relevant to this Complaint, Plaintiff

JORDAN DIFFENDERFER was an employee of Defendant LOWERY

CORPORATION.

2.      Defendant LOWERY CORPORATION dba APPLIED IMAGING and dba

APPLIED INNOVATION ("Defendant APPLIED"), is a Michigan corporation,

that provides office technology products and services and has its primary place of

business County of Kent, State of Michigan.

3.      Defendant JOHN LOWERY is an individual residing in the County of

Kent, State of Michigan who, at all times relevant to this Complaint, was the

chief executive officer of Defendant APPLIED with supervisory

responsibilities over all of Defendant APPLIED's personnel, and regularly

interacted with Plaintiff JORDAN DIFFENDERFER in the County of Kent in

the State of Michigan in the course of his employment with Defendant

APPLIED.

4.      Defendant CASEY LOWERY is an individual residing in the County of

Kent, State of Michigan who, at all times relevant to this Complaint, was either

the chief operating officer or president of Defendant APPLIED with

supervisory responsibilities over all of Defendant APPLIED's personnel, and regularly interacted with Plaintiff JORDAN DIFFENDERFER in the County of Kent in the State of Michigan in the course of his employment with Defendant APPLIED.

5.      Defendant JOHN KONYNENBELT is an individual residing in the County of Kent, State of Michigan who, at all times relevant to this Complaint, was the vice president of sales for Defendant APPLIED with supervisory responsibilities over all of Defendant APPLIED's sales personnel, and regularly interacted with Plaintiff JORDAN DIFFENDERFER in the County of Kent in the State of Michigan in the course of his employment with Defendant APPLIED.

6.      Defendant CHARLIE KEESEE is an individual residing in the County of Kent, State of Michigan who, at all times relevant to this Complaint, was the director of sales for Defendant APPLIED with supervisory responsibilities over all of Defendant APPLIED's sales personnel, and regularly interacted with Plaintiff JORDAN DIFFENDERFER in the County of Kent in the State of Michigan in the course of his employment with Defendant APPLIED.

7.      Defendant ANN EMBREE is an individual residing in the County of Kent, State of Michigan who, at all times relevant to this Complaint, was the Applied

Resources Manager for Defendant APPLIED, and regularly interacted with Plaintiff JORDAN DIFFENDERFER in the County of Kent in the State of Michigan in the course of his employment with Defendant APPLIED.

8.     Defendant KIRK MORGAN is an individual residing in the County of Kent, State of Michigan who, at all times relevant to this Complaint, was Corporate Counsel for Defendant APPLIED with supervisory responsibilities over, and direct involvement in, Defendant APPLIED's human resources function, and regularly interacted with Plaintiff JORDAN DIFFENDERFER in the County of Kent in the State of Michigan in the course of his employment with Defendant APPLIED.

9.     Defendant TYLER HAMERSMA is an individual residing in the County of Kent, State of Michigan who, at all times relevant to this Complaint, was a sales representative for Defendant APPLIED, and regularly interacted with Plaintiff JORDAN DIFFENDERFER in the County of Kent in the State of Michigan in the course of his employment with Defendant APPLIED.

10.     Defendant KYLE MACINTOSH is an individual residing in the County of Kent, State of Michigan who, at all times relevant to this Complaint, was a sales representative for Defendant APPLIED, and regularly interacted with Plaintiff JORDAN DIFFENDERFER in the County of Kent in the State of Michigan in

the course of his employment with Defendant APPLIED.

11.    Defendant JARED WIKE is an individual residing in the County of Kent, State of Michigan who, at all times relevant to this Complaint, was a sales representative for Defendant APPLIED, and regularly interacted with Plaintiff JORDAN DIFFENDERFER in the County of Kent in the State of Michigan in the course of his employment with Defendant APPLIED.

12.    Defendants JONH DOE 1-10 are individuals who, at all times relevant to this Complaint, were employees and/or agents of Defendant APPLIED, and regularly interacted with Plaintiff JORDAN DIFFENDERFER in the County of Kent in the State of Michigan in the course of their employment with Defendant APPLIED.

13.    The amount in controversy exceeds the sum of Seventy-Five Thousand Dollars ($75,000) exclusive of interest and costs.

14.    This Court has jurisdiction of the federal claims asserted herein pursuant to 28 USC 1331. This Court has supplemental jurisdiction over the claims arising under the law of the State of Michigan pursuant to 28 USC 1367 and the principles of pendent jurisdiction.

15.    The unlawful employment practices complained of in this complaint occurred within the Western District of Michigan, and venue is proper within this

District and Division pursuant to 28 USC 1391(a).

## GENERAL  ALLEGATIONS

16.     Plaintiff JORDAN DIFFENDERFER began working for Defendant APPLIED in 2019 as a commission-based sales representative selling office equipment with a sales territory in the Lansing, Michigan area.

17.     From the time Plaintiff joined Defendant APPLIED in 2019, she has been subjected to sexually offensive comments and behaviors. Early on, while working with the Defendant APPLIED's Lansing, Michigan office, Plaintiff reported these offensive comments and behaviors to her supervisor there but was told words to the effect "nothing would happen because others had complained and nothing happened, and that was just the culture of the company."

18.     Plaintiff attempted to adjust her work schedule and time in the office to avoid these offensive encounters.

19.     Nevertheless, Plaintiff persevered and continued to grow as a salesperson, becoming one of Defendant APPLIED's top sales representatives.

20.     In 2022, and because of her successes to date, Plaintiff JORDAN DIFFENDERFER was assigned a sales territory in the Grand Rapids, Michigan area where she continued to be a commission-based sales representative selling office equipment for Defendant APPLIED. Plaintiff then began working out of

Defendant APPLIED's Grand Rapids sales office.

21.    The make-up of Defendant APPLIED's Grand Rapids sales office is predominantly male, with approximately 3 of over 50 sales representatives being female, only 1 female sales manager, and zero female sales directors.

22.    Unfortunately, the environment in the Grand Rapids office was actually worse than what Plaintiff had experienced in Lansing.

23.    Early on in Grand Rapids, Plaintiff was assigned to work with Defendant JARED WIKES, another sales representative. During this time, Defendant WIKES said to Plaintiff JORDAN DIFFENDERFER the only reason Plaintiff had any success was because she was "a pretty face in a skirt". Defendant WIKES also stated to Plaintiff that he did not want to work with her because she was a woman and 'not worth his time'.  Defendant WIKES went so far as to say words to the effect 'women should not be salespersons here'. Plaintiff reported these statements to her manager, and later to Defendants ANN EMBREE and KIRK MORGAN but there was no follow up from any management-level or human resources personnel.

24.    On another occasion involving Defendant WIKES and another female employee, Defendant WIKES told Defendant JOHN KONYNENBELT that Defendant WIKES and the female employee were running late for an appointment because the female employee was performing oral sex on Defendant WIKES.  The

female employee reported this incident to her manager but there was not follow up from any management or human resources personnel.

25.    When that same female employee later changed her hair style, Defendant KONYNENBELT told her to "watch out" because Defendant JOHN LOWERY 'was into redheads with bangs.'

26.    On another occasion, at a sales meeting, another sales representative patted his lap and told Plaintiff to sit there. Another employee witnessed the conduct and apologized to Plaintiff 'on behalf of the men at his company' but again, there was no follow up from any manager or from human resources.

27.    On another occasion, at a company sponsored event after a sales meeting, another sales representative approached Plaintiff and asked her if she wanted to see the tattoo on his penis, and persisted even after she said was offended and repeatedly said no.  Plaintiff reported these statements to her manager, but nothing happened. Again, there was no follow up from any manager or from human resources.

28.    It appeared that there were no guidelines regarding the discussion of sex in the workplace, or warnings that some other employees may find the discussions offensive or even threatening. It was not unusual to hear sales representatives, managers, and even Defendant JOHN LOWREY speak in the workplace about

their personal sexual activity, regardless of who could hear the conversations.

29.    On other occasions Plaintiff observed and personally experienced that some managers were often quick to yell at women when differences of opinion arose, while men's counterpoints of view were routinely addressed in more professional tones.

30.    Indeed, on numerous occasions, Plaintiff's concerns or issues regarding virtually any topic would simply be dismissed by members of management as Plaintiff being "too emotional" or "too sensitive" and that Plaintiff should stop "crying".

31.    At company meetings, management would confer strong nicknames on the top performers who were males such as "dynamite" or "killer" while female top performers were given effeminate nicknames such as "Miss Consistency".

32.    Often during the workday, male sales representatives would routinely play golf or have drinks with management, or management would be available to meet the male sales representative's customers. However, Plaintiff was never invited to play golf with management during a workday, and her requests to have management join in a golf outing with her customers were always denied.

33.    On information and belief, there were other occasions where a sales 'team' was invited a trip on the Defendant APPLIED's private jet, yet the female

members of that team were excluded from traveling on the plane.

34.    Plaintiff's requests for increases in compensation and perquisites were met with the response that Plaintiff still had to prove herself, while other male sales personnel with equal or lesser qualification received those benefits without being told they had to "prove' themselves.

35.    Plaintiff's manager was so concerned about how the company perceived Plaintiff as a female salesperson that she actively campaigned for Plaintiff, arguing to other managers and male sales representatives that Plaintiff 'really was that good'.

36.    Other acts of overt sex discrimination occur regularly. One such incident is Plaintiff's own manager, Joanie Thomas, being passed over for a director position despite being clearly the most qualified for the position. A less qualified male received the position. Thomas told Plaintiff that Thomas believed she had been passed over for the promotion because she was a female, and openly questioned whether she had hit the 'glass ceiling'.

37.    Another aspect of Defendant APPLIED's culture is excessive alcohol consumption, and in particular, male employees of the Defendant APPLIED attempting to get female employees to over-indulge. As an example, Plaintiff recalls an incident at Imagepalooza 2023 where Defendant KONYNENBELT

offered Plaintiff a shot that Plaintiff declined. Defendant KONYNENBELT gave

Plaintiff an annoyed look, and walked away. Later, Plaintiff saw Defendant

KONYNENBELT encouraging a small group to 'do shots'. Defendant

KONYNENBELT continued to provide one female in the group with shots until

she was having difficulty standing, yet Defendant KONYNENBELT continued to

ply her with alcohol while he was laughing and supporting the female until they

left indicating they were going to another bar.

38.    Often company events include drinking opportunities for Defendant

APPLIED's employees, and it is almost more often than not that there is some

form of excessive alcohol consumption on display at such events.

39.    Not unexpectedly, with excessive alcohol consumption comes violence, and

at Defendant APPLIED sponsored events, this violence was often pointed at

women.

40.    On the President's Club trip January 2021, while a group of Defendant

APPLIED employees were at an establishment consuming alcohol, Defendant

MACINTOSH got into a physical altercation with Rob Givans, also an employee

of Defendant APPLIED, when Givans attempted to stop Defendant MACINTOSH

from harassing a waitress. The establishment's management then required

Defendant MACINTOSH to leave the establishment during which time Defendant

MACINTOSH complained out loud for anyone to hear that Givans was "cock blocking" Defendant MACINTOSH. Later that evening at the hotel, Defendant MACINTOSH continued to make threats of violence against Givans.

41.    On the President's Club trip in November 2021, another occasion involving Defendant APPLIED employees drinking, Defendant MCINTOSH got into a physical altercation with Brad Kimball, a sales manager for Defendant APPLIED. In this incident, Defendant MACINTOSH alleged that Kimball claimed Defendant MACINTOSH's wife was trying to have sexual relations with Kimball.

42.    On the President's Club trip November 2022, in Boca Raton, while in a group of Defendant APPLIED employees, Defendant HAMERSMA had been drinking alcohol when he started a physical altercation with another coworker, Jeremy Watson over what appeared to be the manner in which Defendant HAMERSMA was treating a female. This incident occurred in a room that included Defendant JOHN LOWERY, Defendant KONYNENBELT, Andrew Reed, and many others.

43.    There are numerous other examples of intoxicated behaviors by APPLIED employees at company functions. Suffice to say that overindulgence was part of the culture at Defendant APPLIED.

44.    As for the pervasiveness and obviousness of the male-dominated

environment, even Defendant KEESEE, when he first came to the Grand Rapids office, observed it. On one specific occasion, Defendant KEESEE observed the manner in which Plaintiff was being treated by certain male counterparts (as well as other behaviors of male employees) and stated that there was a "Boys Club" environment that needed to addressed. When Defendant KEESEE used the term "Boys Club", this was actually the first time Plaintiff heard this term being used to describe the Defendant APPLIED workplace culture – but it turned out to be spot on.

45.    As if to put an exclamation point on this "Boys Club" environment, the top sales award that Defendant APPLIED awarded to their top salespeople was a "Daytona" Rolex watch. However, the "Daytona" Rolex is designed and marketed as a *man's* watch. So unless a female wants to receive the man's watch, the female can never truly be *in* the Daytona Club. On belief, Defendant APPLIED has rejected requests and/or recommendations to make the easy fix to change the award to the "Rolex Club" award.

46.    To say the environment at Defendant APPLIED was laced with sexual innuendo, gender discrimination, male bravado, and blatant misogyny is clearly an understatement.

47.    During this time, Plaintiff continued to make it known that she strongly

objected to this "Boys Club" environment, demanding that it be brought to an end.

48.    Despite the obvious and significant challenges that existed for her – and any other woman in the Grand Rapids office - Plaintiff dedicated herself to achieving the top sales award in the company for fiscal year 2023 which ended in September 2023.

49.    As the close of the 2023 fiscal year approached, Plaintiff had approximately $1,637,000 in sales but required an additional $13,000 in sales to reach the "Daytona Club" threshold of $1,650,000 in sales. In other words, Plaintiff was less than 1% away from reaching the award.

50.    Despite there being a myriad of things that management could do – and had done with male salespeople in the past - to assist a salesperson who was this close (restructuring existing deals, assisting with calls to customers, etc.), management failed and refused to offer any assistance to Plaintiff.

51.    Plaintiff felt she had already turned over every stone in getting to the point where she was. However, Plaintiff recalled an idea she had heard about among other APPLIED sales representatives whereby they would purchase one or more pieces of equipment themselves. Plaintiff decided to purchase a few copiers in the name of a company she was creating and either use the equipment in a business venture she and her husband were planning, or use the equipment as give-away

14

incentives for future customers (again, an approach that was used by other *male* sales representatives).

52.    The dollar value of this "JAK deal" was approximately $20,000.

53.    Prior to the end of the fiscal year, Plaintiff presented the JAK proposal to her manager and to Defendant CHARLIE KEESEE. Both levels of management responded favorably.

54.    As was common, "Final Stacks" (the stack rankings of all salesperson's performance for the year) including award winners for Presidents Club and the Daytona Club, would not get announced for approximately 2 weeks after the close of the fiscal year.

55.    Presumably, this delay in making announcements allows management to review all deals submitted by sales personnel leading up to the publication of final stack rankings and awards.  Accordingly, not only did Plaintiff review the 'JAK deal' with management before the end of the fiscal year and before the deal was even submitted, but Defendant APPLIED had an additional two weeks to review the deal before making any announcements that might depend on that deal. In other words, this JAK deal was fully visible to all decision makers prior to being acted upon and at no time during the two weeks after the close of the fiscal year, did any member of Defendant APPLIED's sale management team ever suggest that the

proposed JAK deal was 'inappropriate' in any way.

56.    Accordingly, after this thorough review of the JAK deal and all other deals submitted by other sales representatives in the final days of the fiscal year, on October 16, 2023 Defendant APPLIED's management published the final stack rankings for fiscal year 2023 and announced that Plaintiff had achieved the company's highest sales award – the Daytona Club award.

57.    Notably, Defendant KEESSEE indicated to Plaintiff that Plaintiff had reached the Daytona Club award level without regard to the JAK deal, calling into question to the true motive of any further discussion of that transaction

58.    To say that Plaintiff (and her manager who won a team award in large part due to Plaintiff's performance) were excited would be an understatement. Plaintiff had actually achieved a goal that had seemed so far away and was made ever so much more difficult because of the environment in which she worked.

59.    Unfortunately, rather than being able to bask in the glow of this achievement, for the next few months Plaintiff was subjected to ridicule and harassment from her male co-workers who among other things, spread rumors that APPLIED management was reprimanding Plaintiff for 'lacking integrity'.

60.    Although there was nothing 'lacking integrity' in the JAK deal, it is certainly an ethical violation for Plaintiff's confidential information, including details on

specific sales deals, to be leaked and then spread among company personnel.

Defendant APPLIED took no steps to stop the spread of this confidential

information nor the rumors and harassment that ensued.

61.    In conversations with management at this time, Plaintiff was told by

Defendant KEESEE that everything was going to work out and that Plaintiff's

Daytona Club status would not be affected. During this same period, Plaintiff's

manager indicated that Defendant CASEY LOWERY had told her 'not to worry'

and that 'this was going to work out in [Plaintiff's (and the manager's)] favor'.

62.    Oddly, nearly two months after having been given the Daytona Club award,

and as Plaintiff would later write to Defendants, "with no change in circumstances,

no change in information, and no communication or further discussion, suddenly,

out of nowhere, leadership changed their mind." At an irregularly scheduled

meeting on or about November 22, 2023, Defendant KEESEE informed Plaintiff

that she was being stripped of the Daytona Club honor allegedly because of the

JAK deal.

63.    Plaintiff was never provided a written explanation as to why this action was

being taken. However, at this November 22, 2023 meeting, Defendant KEESEE

alleged that Defendant APPLIED management had concluded the JAK deal was

inappropriate as 'lacking integrity'.

64.    Defendant CASEY LOWERY and Defendant KONYNENBELT further explained to Plaintiff that other sales representatives (again, essentially all males) were 'revolting' because they believed that Plaintiff and had not properly earned the Daytona Club award. Defendant CASEY LOWERY and Defendant KONYNENBELT continued that there was a 'firestorm' swirling, and the other employees had become an 'angry mob' and were insisting that Plaintiff be 'stripped' of the Daytona Club award.

65.    Ignoring all of the communications that had previously taken place, Defendant KEESEE added 'if you had only come to us sooner, there were things we could have done, as we have done for other [male] reps.'

66.    After this meeting, Plaintiff approached other members of management in an attempt to get assistance or at least an explanation as to why this was happening to her to no avail.

67.    Finally, on December 1, 2023, Plaintiff provided an email to Defendants KEESEE, KONYNENBELT and CASEY LOWERY in which she thoroughly laid out how the JAK deal had been presented first to her manager, and then to each of these three defendants, noting that she had informed Defendant KEESEE *in writing* of the JAK deal *before* the close of the fiscal year, seriously calling into question Defendant KEESEE's "integrity" while now feigning a lack of knowledge

of the transaction.

68.    In response to Plaintiff's December 1, 2023 correspondence, on December 4, 2023, Plaintiff again met with Defendant KEESEE. In this meeting, Defendant KEESEE again alluded to the JAK deal as 'being problematic' but then added that the decision to take the Daytona Club award away from Plaintiff was also based on 'other information' including Defendant KEESEE's understanding from Defendant WIKES that Plaintiff had requested Defendant WIKES give Plaintiff one or more of his sales in order to put Plaintiff over the Daytona Club award threshold. Defendant KEESEE also told Plaintiff that he had information from 'sales personnel' that Plaintiff was submitting other falsified or improper deals. Plaintiff immediately and vehemently denied these accusations.

69.    This incident is yet another example of how a male employee's 'word' is taken over a woman's, or as often the case, without consulting the other person if the other person is a woman.

70.    Plaintiff immediately called out Defendant WIKES in a text message asking why he would have lied about Plaintiff to Defendant KEESEE in this manner. In response to Plaintiff's inquiry, Defendant WIKES admitted to Plaintiff that Plaintiff had not asked Defendant WIKES for any accounts and that in fact, he (Defendant WIKES) had actually offered to give Defendant HAMERSMA certain

sales "if he was short."

71.    Plaintiff shared this information with Defendant APPLIED's management but there was no response, no action taken and nothing changed.

72.    Despite the fact that such a meeting should have been confidential, in his response to Plaintiff on December 4, 2023, Defendant WIKES also indicated that he was "plugged into what happened and today's meeting". It was obvious to Plaintiff that there was nothing confidential about her discussions with management.

73.    Apparently fueled by the knowledge that their efforts were paying off, Plaintiff's co-workers and the "Boys Club" made the office environment that had previously been toxic toward Plaintiff become more and more lethal. Plaintiff repeatedly complained to various members of management that the lies, rumors, breaches of confidentiality and other talk about Plaintiff in the office were increasing, and getting to the point of actually making Plaintiff feel physically unsafe.

74.    In October 2023, by virtue of attaining the President's Club level of performance, Plaintiff had won a trip for her and her husband to join Plaintiff's co-workers on a trip to the US Virgin Islands that was to take place from December 5-9, 2023. On October 9, 2023, Plaintiff confirmed her intention to attend this award

event. However, on account of the treatment to which Plaintiff was being subjected, Plaintiff had to cancel her participation in this event out of fear for her mental and physical safety, even though her husband would have been with her.

75.    As had begun since being stripped of the Daytona Award, and increasingly through December 2023 as it became apparent that management was not going to alter the discriminatory and harassing behavior to which Plaintiff was being subjected, Plaintiff was falling deeper and deeper into depression and bouts of severe anxiety.

76.    Although Plaintiff had been repeatedly warned that reporting anything to human resources was at best an exercise in futility and at worse harmful to one's career, on December 28, 2023 Plaintiff set up a meeting with Defendant ANN EMBREE – Defendant APPLIED's "Resource Manager" which was set for January 11, 2024. In this meeting, Plaintiff again laid out all that had transpired including how she felt that what was happening to her was the product of the extreme sex discrimination, misogyny and the "Boys Cub" environment. Plaintiff detailed the effect this conduct was having on Plaintiff's health, causing severe anxiety and depression. Plaintiff asked for assistance from Defendant EMBREE.

77.    Rather than investigating any of Plaintiff's concerns, or offering any other form of assistance, Defendant EMBREE - and the rest of Defendant APPLIED's

management - doubled down in their harassment and retaliation against Plaintiff.

78.    In response to her sexual discrimination and harassment complaints to

Defendant EMBREE, Plaintiff was removed from her sales team – the same team

she led to achieve the top sales team in the company the previous year – and placed

Plaintiff on a performance improvement plan reporting directly to Defendant

KEESEE.

79.    Defendant KEESEE proceeded to create an outline of formalistic mundane

requirements that Plaintiff would fulfill as part of this performance improvement

plan – as if a person who had doubled her sales virtually every year of her

employment with Defendant APPLIED and had won the company's top sales

award would benefit from these rudimentary activities.

80.    Evidencing the true intent and motivation behind the performance

improvement plan, in the email laying out the performance improvement plan,

Defendant KEESEE also falsely accused Plaintiff of improperly working on the

Gerber account. Although never made clear, it appears Defendant KEESSEE was

alleging – apparently on behalf of male sales representative who felt slighted - that

the account belonged to another sales representative. In fact, Plaintiff had not only

properly entered the account into Defendant APPLIEDs sales system (a process

that checks for conflicts such as was being alleged), Plaintiff had actually brought

Gerber personnel to the office to meet Defendant APPLIED management several months earlier and Defendant APPLIED management applauded Plaintiff's efforts.

81.    Again, even if there was some confusion over the proper assignment of the Gerber account, when such instances occurred with male sales representative, they were handled very differently, usually being hashed out informally rather than being communicated in a threatening email.

82.    On account of her outstanding performance, Plaintiff had also won a trip for just her and her husband, Plaintiff TYLER KIPPE, to stay at a house in Naples, Florida owned by Defendant LOWERY or Defendant APPLIED. This trip was awarded for attaining the Platinum Club level of performance and was scheduled to take place from January 19-26, 2024.

83.    Not coincidentally, on January 11, 2024 – merely hours after Plaintiff met with Defendant EMBREE and shared with her all of Plaintiff's complaints and health concerns – Defendant JOHN LOWERY's assistant reached out to Plaintiff to set up a dinner between Plaintiff and Defendant JOHN LOWERY that would take place in Florida on January 23, 2024 while Plaintiff and her husband were on this trip.

84.    Although she had been stripped of the Daytona Club award, publicly humiliated, continuously harassed by co-workers with what should have been

confidential information, constantly being accused of 'lacking integrity' and essentially being a 'cheat', and near having a prolonged anxiety attack, Plaintiff went to Florida with her husband for the Platinum Club award trip.

85.    As scheduled, Plaintiff, Co-Plaintiff TYLER KIPPE and Defendant JOHN LOWERY had dinner on January 23, 2024. During this dinner, Plaintiff reviewed with Defendant JOHN LOWERY all that had transpired over the preceding four months, including her concerns over the Boys Club environment, the harassment to which she had been subjected and the unfair stripping away of the Daytona Club award. Plaintiff emphasized to Defendant JOHN LOWERY that what happened to Plaintiff was sex discrimination, harassment and retaliation, and needed to stop.

86.    Defendant JOHN LOWERY proceeded to tell Plaintiffs that Plaintiff was removed from her team and placed on a performance improvement plan "to teach her a lesson" – apparently for complaining about discriminatory treatment - and that Plaintiff needed to get in line, and just "punch through".

87.    Also at the Florida dinner, Defendant JOHN LOWERY further stated that he believed the performance improvement plan itself was 'inappropriate' for a seasoned salesperson, and that he believed it was unlikely Defendant KEESEE would try to hold Plaintiff to the specifics of the plan.

88.    At the Florida dinner, Plaintiff indicated that she would like a public apology

from the people who had humiliated and harassed her over the preceding months.
Defendant JOHN LOWERY responded with words to the effect 'now, you know
we can't do that.'

89.    A week later, back in Michigan, Defendant JOHN LOWERY gave Plaintiff
a purse. Purses had been an award offered to female winners of the Daytona Club
since the Daytona Rolex was a men's watch. [On information, during the Daytona
trip, it is also noted that the men play very nice golf courses while the women
given the award are not allowed to participate.]

90.    While giving the purse to Plaintiff, Defendant JOHN LOWERY explained
that his girlfriend's abusive ex-boyfriend used to give her purses as an apology.
Plaintiff understood that Defendant JOHN LOWERY was giving Plaintiff a purse
couple with this statement as an apology and an admission that he was aware of the
abuse Plaintiff had been experiencing over the preceding months.

91.    However, at this time, Defendant JOHN LOWERY then also insisted that
*Plaintiff* apologize to two male sales managers – Brad Kelly and Dave Smith, the
latter who was Defendant WIKES' sales manager.

92.    In February 2024, a trip was scheduled for Plaintiff's entire sales team on
account of the fact that Plaintiff's team, managed by Joanie Thomas, and
comprised of Plaintiff, Defendant HAMERSMA, Defendant MACINTOSH, Drew

Hubbard and Nick Vanderhorst (the "Thomas Team"), won the award for being the top producing team in the company for fiscal year 2023, largely due to Plaintiff's performance.

93.    The trip involved flying on Defendant APPLIED's private jet to Clearwater, Florida on the morning of February 15, 2024 and flying back to Michigan the following evening, while being put up at the expensive Hotel Zamora.

94.    Initially, Plaintiff indicated she would not be going on this trip citing the same reasons she cited when she did not go on the Presidents Club trip to the Virgin Island; indeed, those reasons had only become more pronounced.

95.    While considering whether or not to go on this trip, Plaintiff recalled that she had approached Defendant KONYNENBELT and asked him to intervene regarding the abusive (and potentially dangerous) treatment Plaintiff was experiencing from her colleagues. Plaintiff had indicated that these behaviors made her feel unsafe in the workplace, and expressed concerns about how these behaviors would manifest if she were to go on any of the company sponsored trips she had won. Defendant KONYNENBELT not only acknowledged the environment Plaintiff described existed, he indicated 'there was nothing he could do' about it, and then Defendant KONYNENBELT actually warned Plaintiff that if she did go any trips that she had won which were taking place in December,

January and February, that he anticipated Plaintiff's male colleagues would be aggressive towards her but that there was nothing he nor Defendant APPLIED could do to stop it.

96.     This concern was all the more real in light of the history of extensive alcohol – and unbeknownst to Plaintiff at the time – drug use, that took place on such company trips that still were going unregulated.

97.     However, Plaintiff's manager, Joanie Thomas, continued to try to convince Plaintiff to go on the team award trip pointing out that Plaintiff was a main reason the team had won the trip in the first place. After repeated requests by Thomas, Plaintiff gave in and agree to go.

98.     The Thomas Team flew down to Florida on February 15, 2024 on Defendant APPLIED's private jet, and checked in to the Hotel Zamora in Clearwater, Florida around noon. The group met for dinner around 6:00 pm.

99.     After dinner, and recalling how Defendant KONYNENBELT had responded when she refused to drink with him, Plaintiff agreed to go out for drinks.

100.    During this time, Defendant HAMERSMA and Defendant MACINTOSH began to ask Plaintiff about having lost the Daytona Club award. As Plaintiff became increasingly upset about the questions, Defendant HAMERSMA and Defendant MACINTOSH offered more and more alcohol to Plaintiff. Defendant

HAMERSMA and Defendant MACINTOSH continued back and forth with the questioning and the alcohol.

101.   After a while of this treatment, Plaintiff was visibly upset to those around her, breaking down into tears on numerous occasions. Plaintiff recalls that at this point, Defendant HAMERSMA said to Plaintiff that Plaintiff's crying was actually turning him on.

102.   Plaintiff believes that while she was in this vulnerable condition, Defendant HAMERSMA and/or Defendant MACINTOSH drugged Plaintiff's drink with an MDMA-like substance.

103.    Later that evening, Defendant HAMERSMA and Defendant MACINTOSH took Plaintiff to Defendant HAMERSMA's hotel room where the increasingly incapacitated Plaintiff was plied with additional alcohol until nearly passing out, physically carried to a bed while semi-conscious, and then sexually assaulted.

104.   When Plaintiff was able, she went back to her own hotel room. Plaintiff then reported the incident to her manager. Plaintiff was in shock.

105.   Plaintiff was taken to a sexual assault clinic in Clearwater, Florida and evaluated. Plaintiff remained in shock.

106.   However, Plaintiff was then forced to board the private jet and fly back to Michigan with the individuals who assaulted her.

107.    Once back in Michigan, Plaintiff remained in shock.

108.    On Sunday, February 18, 2024, Plaintiff worked with the agency that had

assisted with her sexual assault exam in Florida to report the sexual assault that had

occurred to both the Pinellas County (Florida) Sherrif Department as well as the

Kent County (Michigan) Sherrif Department.

109.    No one from Plaintiff's employer reached out to Plaintiff until Monday

evening, at which time Defendant EMBREE scheduled a Teams meeting call for

Tuesday morning, February 20, 2024. At this meeting, Plaintiff reported what had

transpired in Florida on February 15 and 16, 2024, including that Plaintiff had been

drugged and sexually assaulted. Plaintiff identified Defendant HAMERSMA and

Defendant MACINTOSH as her assailants.

110.    Despite assurances from the Defendant EMBREE that there would be a

prompt investigation by Defendant APPLIED and that Plaintiff would be kept

informed of what was going on, nothing took place. Neither Defendant EMBREE,

Defendant MORGAN, nor anyone else from Defendant APPLIED took any steps

to contact authorities nor to protect Plaintiff.

111.    Instead, Defendant EMBREE began sending Plaintiff text messages and

emails asking Plaintiff if "everything is going well", if Plaintiff "had a nice

weekend" and if Plaintiff "had a great week", as if oblivious to what Plaintiff had

reported to her.

112.   Plaintiff followed up with the two police departments again on February 26, 2024 and an appointment was set up for later that week.

113.   On advice of the police, and not having received any assurances from Defendant APPLIED that they would be doing anything to protect her, Plaintiff filed for personal protection orders against Defendant HAMERSMA and Defendant MACINTOSH on February 28, 2024.

114.   Plaintiff provided Defendant APPLIED with copies of the personal protection orders and asked that if they gave the orders to Defendant HAMERSMA and Defendant MACINTOSH, to let Plaintiff know. Defendant EMBREE refused this simple request.

115.   Instead, Defendant EMBREE and Defendant MORGAN advised Plaintiff that the personal protection orders precluded Plaintiff from being on Defendant APPLIED'S premises at the same time that Defendant HAMERSMA and Defendant MACINTOSH were there, and therefore, Plaintiff should make sure to let Defendant APPLIED know when she was going to be on the company property so that Defendant APPLIED could let them know.

116.   On information and belief, as news came out regarding the Florida incident, other female employees at Defendant APPLIED felt empowered to come out and

report that they, too, had had similar drugging and sexual assault encounters with Defendant HAMERSMA and/or Defendant MACINTOSH. Indeed, on at least one occasion, another female employee of Defendant APPLIED reported to Defendant APPLIED management that she believed that she had been given a 'date rape' drug by Defendant HAMERSMA and/or Defendant MACINTOSH and thereafter assaulted. Not only did Defendant APPLIED take no corrective action with respect to this report, it does not appear the incident was even investigated.

117.   On information and belief, these allegations were ignored by Defendant EMBREE and Defendant MORGAN, specifically, and Defendant APPLIED, generally.

118.   Defendant APPLIED routinely allowed Defendant HAMERSMA and/or Defendant MACINTOSH onto company property during the pendency of the personal protection orders and during the investigations into their assaultive conduct.

119.   Defendant EMBREE, Defendant MORGAN and Defendant APPLIED, generally, further violated Plaintiff's rights and engaged in wrongful conduct by isolating Plaintiff, instructing Plaintiff's co-workers not to interact with Plaintiff or speak to her about what had happened with respect to Florida and other concerns that Plaintiff had raised.

120.   Defendant EMBREE, Defendant MORGAN, and Defendant APPLIED

generally, failed to properly investigate complaints of sex discrimination, sex

harassment, sexual assault, and violence in the workplace and failed and or refused

to create and/or adequately enforce policies and procedures to prevent and/or shut

down such wrongful acts.

121.   Ultimately, Defendant APPLIED has taken no corrective action with respect

to any of the sex discrimination, sex harassment, sexual assault, and violence in the

workplace which had been reported to them, or regarding which they were or

should have been aware.

122.   Defendant APPLIED's own discriminatory policies and procedures, and

Defendant APPLIED's failure to take corrective action with respect to any of the

sex discrimination, sex harassment, sexual assault, and violence in the workplace

which had been reported to them, or regarding which they were or should have

been aware was a proximate cause of the harms suffered upon Plaintiff including

Plaintiff being subjected to sexually harassing and demeaning language, Plaintiff

being discriminated on account of her sex with respect to material aspects of her

job, Plaintiff being subjected to remedial and disciplinary actions that were applied

in a sexually discriminatory manner, creating an environment dripping with

misogyny wherein it was more likely that Plaintiff would be subjected to a sexual

assault such as what occurred in Florida on February 15 and 16, 2024.

123.   As a proximate result of the aforementioned wrongful conduct by all
Defendants, Plaintiff has been disabled from working on account of chronic post
traumatic stress disorder, anxiety disorder, severe sleep disturbance and other
mental and psychological impairments, and has thereby been constructively
discharged from her employment.

124.   As a proximate result of the aforementioned wrongful conduct by all
Defendants, Plaintiff JORDAN DIFFENDERFER and Plaintiff TYLER KIPPE
have suffered and will continue to suffer into the foreseeable future substantial
economic damages including lost wages, lost commissions, lost bonuses, lost
insurance and retirement benefits, lost perquisites and other economic losses.

125.   As a proximate result of the aforementioned wrongful conduct by all
Defendants,  Plaintiff JORDAN DIFFENDERFER and Plaintiff TYLER KIPPE
have suffered and will continue to suffer into the foreseeable future substantial
non-economic damages including anxiety, depression, stress, mental anguish,
embarrassment, humiliation, damage to reputation, loss of consortium, and other
non-economic damages.

## COUNT I
## VIOLATION OF THE CIVIL RIGHTS ACT:
## SEX DISCRIMINATION

126.   Plaintiffs incorporate by reference all facts and allegations elsewhere set forth in this Complaint.

127.   At all times relevant hereto Plaintiff was qualified for protection against discrimination under Title VII, the Civil Rights Act of 1964, as amended, hereinafter referred to as the "CRA".

128.   Pursuant to the CRA, including without limitation, 42 U.S.C. §2000e, it shall be unlawful for an employer:

   a.  to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

   b.  to limit, segregate, or classify their employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect their status as an employee, because of such individual's race, color, religion, sex, or national origin.

129.   Defendants are employers within the meaning of the CRA.

130.   Defendants wrongfully discriminated against Plaintiff on account of her sex and violated the CRA in several particulars, including without limitation:

   a.  Making and/or failing to address sexually derogatory and/or harassing comments in the workplace;

b.  Making and/or failing to address violent and sexually violent behaviors and environments in the workplace;

c.  Creating and maintaining sexually discriminatory practices and procedures including without limitation, practices and procedures pertaining to achieving sales goals, territory definitions and interpretations, deal structures and other job perquisites;

d.  Failing to provide formal managerial support to female employees in the same manner as provided male employees, including without limitation, training, assistance with structuring proposed sales, achieving sales goals, enforcing fair territory definitions and interpretations, support at social engagements and golfing events, and management appearances at client functions;

e.  Failing to provide informal managerial support to female employees in the same manner as provided male employees, including without limitation, social engagements, golfing entertainment, management appearances at client functions, interceding on Plaintiff's behalf to stop slanderous statements from co-workers, taking a male employee's word over Plaintiff's word merely on account of the parties genders, suggesting that Plaintiff ought to apologize to co-workers after having

told Plaintiff management could not ask other employees to apologize to Plaintiff;

f.  Failing to provide promotional opportunities to female employees in the same manner as provided male employees, including without limitation, job promotions, pay raises, or other favorable designations;

g.  Selectively and discriminatorily imposing Defendant's alleged 'ethics rules';

h.  Awarding and then stripping Plaintiff of the Daytona Club award;

i.  Placing Plaintiff on a performance improvement plan;

j.  Falsely accusing Plaintiff of made up ethical violations in order to buttress prior acts of discrimination;

k.  Leaking Plaintiff's confidential information regarding her performance, and performance reviews;

l.  Maintaining a disproportionately male sales force in the Grand Rapids office;

m. Failing to adequately respond to Plaintiff's allegations regarding harassment, discrimination and sexual assault;

n.  Undermining Plaintiff's efforts to perform her job responsibilities;

o.  Depriving Plaintiff of opportunities for job assignments outside of the influence of those personnel engaged in discriminating against her;

p.  Creating or allowing to exist a work environment hostile to female sales representatives;

q.  Subjecting Plaintiff to other harassing or otherwise unlawful statements or behaviors on account of her sex;

r.  Other acts of discrimination to be determined through discovery.

131.  As a result of Defendants' discriminatory conduct toward Plaintiff, Plaintiffs have suffered the above-referenced economic and non-economic injuries and damages, and will continue to suffer these damages into the foreseeable future.

WHEREFORE, Plaintiffs pray for judgment against Defendants, jointly and severally, in an amount the Court or jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with interest, costs, liquidated and/or punitive damages, and attorney fees as allowed by law.

**COUNT II**
**VIOLATION OF THE CIVIL RIGHTS ACT:**
**HARASSMENT/HOSTILE WORK ENVIRONMENT**

132.  Plaintiffs incorporate by reference all facts and allegations elsewhere set forth in this Complaint.

133.  At all times relevant hereto Plaintiff was qualified for protection against

harassment and a hostile work environment under the CRA.

134.    Defendants engaged in behaviors that constitute harassment and behaviors that created a hostile work environment in violation of the CRA in several particulars, including without limitation:

    a.  Making and/or failing to address sexually derogatory and/or harassing comments in the workplace;

    b.  Making and/or failing to address violent and sexually violent behaviors and environments in the workplace;

    c.  Creating and maintaining sexually discriminatory practices and procedures including without limitation, practices and procedures pertaining to achieving sales goals, territory definitions and interpretations, deal structures and other job perquisites;

    d.  Failing to provide formal managerial support to female employees in the same manner as provided male employees, including without limitation, training, assistance with structuring proposed sales, achieving sales goals, enforcing fair territory definitions and interpretations, support at social engagements and golfing events, and management appearances at client functions;

    e.  Failing to provide informal managerial support to female employees in

the same manner as provided male employees, including without

limitation, social engagements, golfing entertainment, management

appearances at client functions, interceding on Plaintiff's behalf to stop

slanderous statements from co-workers, taking a male employee's word

over Plaintiff's word merely on account of the parties genders,

suggesting that Plaintiff ought to apologize to co-workers after having

told Plaintiff management could not ask other employees to apologize to

Plaintiff;

f.  Failing to provide promotional opportunities to female employees in the

same manner as provided male employees, including without limitation,

job promotions, pay raises, or other favorable designations;

g.  Selectively and discriminatorily imposing Defendant's alleged 'ethics

rules';

h.  Awarding and then stripping Plaintiff of the Daytona Club award;

i.  Placing Plaintiff on a performance improvement plan;

j.  Falsely accusing Plaintiff of made up ethical violations in order to

buttress prior acts of discrimination;

k.  Leaking Plaintiff's confidential information regarding her performance,

and performance reviews;

l.  Maintaining a disproportionately male sales force in the Grand Rapids office;

m. Failing to adequately respond to Plaintiff's allegations regarding harassment, discrimination and sexual assault;

n.  Undermining Plaintiff's efforts to perform her job responsibilities;

o.  Depriving Plaintiff of opportunities for job assignments outside of the influence of those personnel engaged in discriminating against her;

p.  Creating or allowing to exist a work environment hostile to female sales representatives;

q.  Subjecting Plaintiff to other harassing or otherwise unlawful statements or behaviors on account of her sex;

r.  Other acts of discrimination to be determined through discovery.

135.  As a result of Defendants' behaviors that caused harassment and a  hostile work environment, Plaintiffs have suffered the above-referenced economic and non-economic injuries and damages, and will continue to suffer these damages into the foreseeable future.

WHEREFORE, Plaintiffs pray for judgment against Defendants, jointly and severally, in an amount the Court or jury determines to be fair, just, and adequate

compensation for the injuries and damages sustained, together with interest, costs, liquidated and/or punitive damages, and attorney fees as allowed by law.

## COUNT III
## VIOLATION OF THE CIVIL RIGHTS ACT:
## RETALIATION

136.    Plaintiffs incorporate by reference all facts and allegations elsewhere set forth in this Complaint.

137.    Pursuant to the CRA, including without limitation, 42 U.S.C. §2000e-3, it is unlawful for an employer to retaliate against an employee because that employee "opposed any practice made an unlawful employment practice by this subchapter".

138.    Defendants unlawfully retaliated against Plaintiff in violation of the CRA in several particulars, including without limitation:

  a.  Stripping Plaintiff of the Daytona Club award in retaliation for having complained about being subjected to a sexually discriminatory work environment throughout her employment with Defendant APPLIED,

  b.  Failing to support or protect Plaintiff from aggressive and slanderous comments Plaintiff experienced from co-workers from October 2023 through the present in retaliation for having complained about being

subjected to a sexually discriminatory work environment throughout her employment with Defendant APPLIED;

c.  Being removed from her team, placed on a performance improvement plan, and otherwise isolated and denigrated in retaliation for more recent complaints of sex discrimination (including being stripped of the Daytona Club award, and not receiving management support regarding aggressive and slanderous comments Plaintiff was experiencing from co-workers);

d.  Refusing to adequately investigate or cooperate with authorities in the investigation of the sexual assault alleged herein in retaliation for Plaintiff's filing a charge with the Equal Employment Opportunity Commission;

e.  Being denied common benefits of employment with Defendant APPLIED;

f.  Subjecting Plaintiff to other retaliatory and unlawful behaviors;

g.  Other acts of retaliation discrimination to be determined through discovery.

139.   As a result of Defendants' retaliatory conduct toward Plaintiff, Plaintiffs

have suffered the above-referenced economic and non-economic injuries and

damages, and will continue to suffer these damages into the foreseeable future.

WHEREFORE, Plaintiffs pray for judgment against Defendants, jointly and

severally, in an amount the Court or jury determines to be fair, just, and adequate

compensation for the injuries and damages sustained, together with interest, costs,

liquidated and/or punitive damages, and attorney fees as allowed by law.

## COUNT IV
## VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT:
## SEX DISCRIMINATION

140.   Plaintiffs incorporate by reference all facts and allegations elsewhere

set forth in this Complaint.

141.   At all times relevant hereto Plaintiff was qualified for protection against sex

discrimination under the Elliot-Larsen Civil Rights Act, hereinafter referred to as

the "ELCRA", Michigan Compiled Laws ("MCL") 37.2012, *et seq*.

142.   Pursuant to the ELCRA, it is unlawful for an employer to discriminate

against an employee with respect to any aspect of employment on account of sex.

143.   At all times relevant hereto, Defendants were "employers" within the

meaning of §201(a) of the ELCRA.

144.   Defendants wrongfully discriminated against Plaintiff on account of her sex and violated the ELCRA in several particulars, including without limitation:

a.   Making and/or failing to address sexually derogatory and/or harassing comments in the workplace;

b.   Making and/or failing to address violent and sexually violent behaviors and environments in the workplace;

c.   Creating and maintaining sexually discriminatory practices and procedures including without limitation, practices and procedures pertaining to achieving sales goals, territory definitions and interpretations, deal structures, and other job perquisites;

d.   Failing to provide formal managerial support to female employees in the same manner as provided male employees, including without limitation, training, assistance with structuring proposed sales, achieving sales goals, enforcing fair territory definitions and interpretations, support at social engagements and golfing events, and management appearances at client functions;

e.   Failing to provide informal managerial support to female employees in the same manner as provided male employees, including without limitation, social engagements, golfing entertainment, management

appearances at client functions, interceding on Plaintiff's behalf to stop slanderous statements from co-workers, taking a male employee's word over Plaintiff's word merely on account of the parties genders, suggesting that Plaintiff ought to apologize to co-workers after having told Plaintiff management could not ask other employees to apologize to Plaintiff;

f.  Failing to provide promotional opportunities to female employees in the same manner as provided male employees, including without limitation, job promotions, pay raises, or other favorable designations;

g.  Selectively and discriminatorily imposing Defendant's alleged 'ethics rules';

h.  Awarding and then stripping Plaintiff of the Daytona Club award;

i.  Placing Plaintiff on a performance improvement plan;

j.  Falsely accusing Plaintiff of made up ethical violations in order to buttress prior acts of discrimination;

k.  Leaking Plaintiff's confidential information regarding her performance, and performance reviews;

l.  Maintaining a disproportionately male sales force in the Grand Rapids office;

m. Failing to adequately respond to Plaintiff's allegations regarding harassment, discrimination and sexual assault;

n. Undermining Plaintiff's efforts to perform her job responsibilities;

o. Depriving Plaintiff of opportunities for job assignments outside of the influence of those personnel engaged in discriminating against her;

p. Creating or allowing to exist a work environment hostile to female sales representatives;

q. Subjecting Plaintiff to other harassing or otherwise unlawful statements or behaviors on account of her sex;

r. Other acts of discrimination to be determined through discovery.

145. As a result of Defendants' discriminatory conduct toward Plaintiff, Plaintiffs have suffered the above-referenced economic and non-economic injuries and damages, and will continue to suffer these damages into the foreseeable future.

WHEREFORE, Plaintiffs pray for judgment against Defendants, jointly and severally, in an amount the Court or jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with interest, costs, liquidated and/or punitive damages, and attorney fees as allowed by law.

**COUNT V**
**VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT:**
**HARASSMENT/HOSTILE WORK ENVIRONMENT**

146.   Plaintiffs incorporate by reference all facts and allegations elsewhere
set forth in this Complaint.

147.   At all times relevant hereto Plaintiff was qualified for protection against sex
harassment and a hostile work environment under the ELCRA.

148.   Defendants engaged in behaviors that constitute harassment and behaviors
that created a hostile work environment in violation of the CRA in several
particulars, including without limitation:

a.  Making and/or failing to address sexually derogatory and/or harassing
comments in the workplace;

b.  Making and/or failing to address violent and sexually violent behaviors
and environments in the workplace;

c.  Creating and maintaining sexually discriminatory practices and
procedures including without limitation, practices and procedures
pertaining to achieving sales goals, territory definitions and
interpretations, deal structures, and other job perquisites;

d.  Failing to provide formal managerial support to female employees in the
same manner as provided male employees, including without limitation,

training, assistance with structuring proposed sales, achieving sales goals, enforcing fair territory definitions and interpretations, support at social engagements and golfing events, and management appearances at client functions;

e. Failing to provide informal managerial support to female employees in the same manner as provided male employees, including without limitation, social engagements, golfing entertainment, management appearances at client functions, interceding on Plaintiff's behalf to stop slanderous statements from co-workers, taking a male employee's word over Plaintiff's word merely on account of the parties genders, suggesting that Plaintiff ought to apologize to co-workers after having told Plaintiff management could not ask other employees to apologize to Plaintiff;

f. Failing to provide promotional opportunities to female employees in the same manner as provided male employees, including without limitation, job promotions, pay raises, or other favorable designations;

g. Selectively and discriminatorily imposing Defendant's alleged 'ethics rules';

h. Awarding and then stripping Plaintiff of the Daytona Club award;

i.   Placing Plaintiff on a performance improvement plan;

j.   Falsely accusing Plaintiff of made up ethical violations in order to buttress prior acts of discrimination;

k.   Leaking Plaintiff's confidential information regarding her performance, and performance reviews;

l.   Maintaining a disproportionately male sales force in the Grand Rapids office;

m.  Failing to adequately respond to Plaintiff's allegations regarding harassment, discrimination and sexual assault;

n.   Undermining Plaintiff's efforts to perform her job responsibilities;

o.   Depriving Plaintiff of opportunities for job assignments outside of the influence of those personnel engaged in discriminating against her;

p.   Creating or allowing to exist a work environment hostile to female sales representatives;

q.   Subjecting Plaintiff to other harassing or otherwise unlawful statements or behaviors on account of her sex;

r.   Other acts of discrimination to be determined through discovery.

149.  As a result of Defendants' discriminatory conduct toward Plaintiff, Plaintiffs have suffered the above-referenced economic and non-economic injuries and

damages, and will continue to suffer these damages into the foreseeable future.

WHEREFORE, Plaintiffs pray for judgment against Defendants, jointly and severally, in an amount the Court or jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with interest, costs, liquidated and/or punitive damages, and attorney fees allowed by law.

## COUNT VI
## VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT: RETALIATION

150.   Plaintiffs incorporate by reference all facts and allegations elsewhere set forth in this Complaint.

151.   Pursuant to the ELCRA, it is unlawful for an employer to retaliate against an person because that person "opposed a violation of this act".

152.   Defendants unlawfully retaliated against Plaintiff in violation of the ELCRA in several particulars, including without limitation:

a. Stripping Plaintiff of the Daytona Club award in retaliation for having complained about being subjected to a sexually discriminatory work environment throughout her employment with Defendant APPLIED;

b. Failing to support or protect Plaintiff from aggressive and slanderous comments Plaintiff experienced from co-workers from October 2023 through the present in retaliation for having complained about being

subjected to a sexually discriminatory work environment throughout her employment with Defendant APPLIED;

c.  Being removed from her team, placed on a performance improvement plan, and otherwise isolated and denigrated in retaliation for more recent complaints of sex discrimination (including being stripped of the Daytona Club award, and not receiving management support regarding aggressive and slanderous comments Plaintiff was experiencing from co-workers);

d.  Refusing to adequately investigate or cooperate with authorities in the investigation of the sexual assault alleged herein in retaliation for Plaintiff's filing a charge with the Equal Employment Opportunity Commission;

e.  Subjecting Plaintiff to other retaliatory and unlawful behaviors;

f.  Other acts of retaliation discrimination to be determined through discovery.

153.  As a result of Defendants' retaliatory conduct toward Plaintiff, Plaintiffs have suffered the above-referenced economic and non-economic injuries and damages, and will continue to suffer these damages into the foreseeable future.

WHEREFORE, Plaintiffs pray for judgment against Defendants, jointly and severally, in an amount the Court or jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with interest, costs, liquidated and/or punitive damages, and attorney fees as allowed by law.

**COUNT VII**
**ASSAULT**

154.   Plaintiffs incorporate by reference all facts and allegations elsewhere set forth in this Complaint.

155.   At the time and place set forth above, Defendant HAMERSMA and Defendant MACINTOSH drugged and sexually assaulted Plaintiff.

156.   As a result of the assault by Defendant HAMERSMA and Defendant MACINTOSH, Plaintiffs have suffered the above-referenced economic and non-economic injuries and damages, and will continue to suffer these damages into the foreseeable future.

WHEREFORE, Plaintiffs pray for judgment against Defendant HAMERSMA and Defendant MACINTOSH, jointly and severally, in an amount the Court or jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with interest, costs, liquidated and/or punitive damages, and attorney fees as allowed by law.

## COUNT VIII
## DEFAMATION

157.   Plaintiffs incorporate by reference all facts and allegations elsewhere set forth in this Complaint.

158.   Defendant JARED WIKE and Defendants JOHN DOES 1-10 made numerous false and/or materially misleading statements regarding Plaintiff TO Defendant APPLIED, Defendant APPLIED employees and others, including without limitation:

    a.  That Plaintiff submitted 'fake' deals to Defendant APPLIED;

    b.  That Plaintiff did not have management approval to submit the JAK deal;

    c.  That Plaintiff engaged in unethical business practices at Defendant APPLIED with respect to the Gerber account;

    d.  That Plaintiff lacked integrity in her dealings with Defendant APPLIED;

    e.  That Plaintiff lied about being sexually assaulted in Florida;

    f.  Other defamatory statements to be clarified through discovery.

159.   Numerous statements made, or repeated, by the other Defendants regarding Plaintiff were false and/or materially misleading, including without limitation the statements identified above and other defamatory statements to be clarified through discovery.

160.   Defendants conspired with one another with respect to making the aforementioned defamatory remarks.

161.   The publication of these statements by each specific person engaged in the publication was not privileged.

162.   The publication of these each of these remarks individually and collectively has resulted in the economic and non-economic damages set forth above.

163.   Defendants' accusations were defamation per se.

164.   As the direct and proximate result of the aforementioned wrongful conduct, Plaintiffs have suffered the above-referenced economic and non-economic injuries and damages, and will continue to suffer these damages into the foreseeable future.

WHEREFORE, Plaintiffs pray for judgment against Defendants, jointly and severally, in an amount the Court or jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with interest, costs, liquidated and/or punitive damages, and attorney fees as allowed by law.

## COUNT IX
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

165.   Plaintiffs incorporate by reference all facts and allegations elsewhere set forth in this Complaint.

166.   The conduct that Defendants engaged in, or conspired to engage in, toward Plaintiff as outlined above was intentional.

167.   The conduct of Defendants toward Plaintiff as outlined above was extreme, outrageous, and of a character not to be tolerated by a civilized society, including without limitation, engaging in, and/or conspiring to engage in a campaign to destroy the credibility, reputation and ultimately the career a female sales representative through a variety of means including sexually discriminatory conduct, harassment, defamation, gaslighting, public humiliation, isolation, alleged disciplinary conduct, drugging, and sexually assaultive behavior.

168.   The conduct of Defendants toward Plaintiff as outlined above was for an ulterior motive or purpose.

169.   The conduct of Defendants toward Plaintiff as outlined above resulted in Plaintiff experiencing severe and serious emotional distress, among other injuries economic and non-economic.

170.   As the direct and proximate result of the aforementioned wrongful conduct, Plaintiffs have suffered the above-referenced economic and non-economic injuries and damages, and will continue to suffer these damages into the foreseeable future.

WHEREFORE, Plaintiffs pray for judgment against Defendants, jointly and severally, in an amount the Court or jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with interest, costs, liquidated and/or punitive damages, and attorney fees as allowed by law.

## COUNT X
## NEGLIGENT RETENTION AND/OR SUPERVISION

171.   Plaintiffs incorporate by reference all facts and allegations elsewhere set forth in this Complaint.

172.   Defendant APPLIED, Defendant JOHN LOWERY, Defendant CASEY LOWERY, Defendant JOHN KONYNENBELT, Defendant CHARLIE KEESEE, Defendant ANN EMBREE and Defendant KIRK MORGAN had a duty to use due care to avoid the retention of employees whom it knows or should know is a person unworthy, by habits, temperament, or nature, to deal with other persons.

173.   The foregoing Defendants breached the aforementioned duty of care by retaining Defendant HAMERSMA, Defendant MACINTOSH, Defendant WIKE, and Defendants 1-10 despite knowledge of circumstances whereby they knew or should have known the named Defendants were unworthy, by habits, temperament, or nature, to deal with other persons.

174.   Defendant HAMERSMA, Defendant MACINTOSH, Defendant WIKE, and Defendants 1-10 caused harm to Plaintiffs in the numerous ways set forth in this Complaint.

175.   As the direct and proximate result of the aforementioned wrongful conduct, Plaintiffs have suffered the above-referenced economic and non-economic injuries and damages, and will continue to suffer these damages into the foreseeable future.

WHEREFORE, Plaintiffs pray for judgment against Defendant APPLIED, Defendant JOHN LOWERY, Defendant CASEY LOWERY, Defendant JOHN KONYNENBELT, Defendant CHARLIE KEESEE, Defendant ANN EMBREE and Defendant KIRK MORGAN, jointly and severally, in an amount the Court or jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with interest, costs, liquidated and/or punitive damages, and attorney fees as allowed by law.

### COUNT XI
### BREACH OF CONTRACT

176.   Plaintiffs incorporate by reference all facts and allegations elsewhere set forth in this Complaint.

177.   The opportunity to earn the Daytona Club award and other commissions and/or benefits constituted a contract.

178.   Plaintiff performed the terms of the contract such that she earned the Daytona Club award and other promised commissions and/or benefits.

179.   Defendants breached this contract by failing to honor their end of the bargain and deprived Plaintiff of the benefits of the contract she performed.

180.   As a result of this breach of contract, Plaintiffs have suffered significant economic losses.

WHEREFORE, Plaintiffs pray for judgment against Defendants, jointly and severally, in an amount the Court or jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with interest, costs, liquidated and/or punitive damages, and attorney fees as allowed by law.

## COUNT XII
## MICHIGAN SALES REPRESENTATIVE ACT, MCL 600.2961

181.   Plaintiffs incorporate by reference all facts and allegations elsewhere set forth in this Complaint.

182.   Defendant APPLIED sells products in Michigan.

183.   Plaintiff contracted with Defendant APPLIED for the solicitation of orders for the sale of goods and was paid, in whole or in part, by commission.

184.   Plaintiff has been constructively terminated on account of the disability caused by Defendants.

185.   Defendant APPLIED has intentionally failed to pay Plaintiff all of the sales commissions that were due Plaintiff.

186.   Under the subject circumstances, the Michigan Sales Representative Act entitles Plaintiff to certain statutory damages as well as attorney fees.

187.   Some or all of the Defendants conspired to deprive Plaintiff of sales commissions to which she was entitled.

WHEREFORE, Plaintiffs pray for judgment against Defendants, jointly and severally, in whatever amount the Court or jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with interest, costs, liquidated and/or punitive damages, and attorney fees as allowed by law.

Respectfully Submitted,

November 19, 2024                    /s/ Paul J. Dillon
                                     Paul J. Dillon (P46913)
                                     Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF MICHIGAN

JORDAN DIFFENDERFER and
TYLER KIPPE,

     Plaintiffs,                                     Case No. 2024-

vs.                                                          Hon.

LOWERY CORPORATION dba APPLIED
IMAGING and dba APPLIED INNOVATION,
a Michigan corporation, JOHN LOWERY,
CASEY LOWERY, JOHN KONYNENBELT,
CHARLIE KEESEE, ANN EMBREE,
KIRK MORGAN, TYLER HAMERSMA,
KYLE MACINTOSH, JORDAN WIKE,
and JOHN DOES 1-10,

     Defendants.

---

DILLON & DILLON, P.L.C.
Paul J. Dillon (P46913)
*Attorney for Plaintiffs*
9429 S. Main Street
Plymouth, MI 48170
(734) 455-9000
*pjdillon@ddplc.net*

---

## JURY DEMAND

Plaintiffs, JORDAN DIFFENDERFER and TYLER KIPPE, by and through their attorneys, DILLON & DILLON, P.L.C., hereby demand a trial by jury on all issues set forth in the preceding Complaint.

Respectfully Submitted,

November 19, 2024                    /s/ Paul J. Dillon
                                     Paul J. Dillon (P46913)
                                     Attorney for Plaintiffs